**Yolanda COX, Janine Dalrymple, Marie Hogsed, Ora Mae Ledford, and Phyllis Stalcup, for themselves and all others similarly situated, Plaintiffs,**

v.

**INDIAN HEAD INDUSTRIES, INC., a Delaware corporation; MGM Brakes, a division of Indian Head Industries, Inc.; and Franklin Barnett, Defendants.**

No. 2:98CV175–T.

United States District Court,
W.D. North Carolina,
Bryson City Division.

June 5, 2000.

David C. Pishko, Elliot, Pishko, Gelbin & Morgan, P.A., Winston–Salem, NC, J. Griffin Morgan, Elliott, Pishko, Gelbin & Morgan, Winston–Salem, NC, for plaintiffs.

Philip M. Van Hoy, Stephen J. Dunn, Van Hoy, Reutlinger, & Taylor, Charlotte, NC, for Indian Head Industries, Inc., MGM Brakes, defendants.

Robert B. Long, Jr., Kimberly A. Lyda, Hartsell & White, Concord, NC, for Franklin Barnett, defendant.

## MEMORANDUM AND ORDER

THORNBURG, District Judge.

·THIS MATTER is before the Court on the Plaintiffs' and Defendants' timely filed objections to the Memorandum and Recommendation of United States Magistrate Judge Max O. Cogburn, Jr. Pursuant to standing orders of designation and 28 U.S.C. § 636, the undersigned referred the Defendants' motions for summary judgment to the Magistrate Judge for a recommendation as to disposition. Having conducted a *de novo* review to those portions of the recommendation to which specific objections were filed, the recommendation is adopted, 28 U.S.C. § 636(b); Fed. R.Civ.P. 72, subject to the following exception: with respect to the fourth cause of action, a common law claim for wrongful discharge, the Court disagrees with the Magistrate Judge and finds that claim survives summary judgment as well.

## I. STANDARD OF REVIEW

Summary judgment is appropriate if there is no genuine issue of material fact and judgment for the moving party is warranted as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue exists if a reasonable jury considering the evidence could return a verdict for the nonmoving parties, here the Plaintiffs. *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Thus, the Defendants as the moving parties have the initial burden to show a lack of evidence to support Plaintiffs' case. *Id.* (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If this showing is made, the burden then shifts to the Plaintiffs who must convince the Court that a triable issue does exist. *Id.* Such an issue will be shown "if the evidence is such that a reasonable jury could return a verdict for the [Plaintiffs]." *Id.* A "mere scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* Moreover, in considering the facts for the purposes of this motion, the Court will view the pleadings and material presented in the light most favorable to the Plaintiffs, as the nonmoving parties. *Matsushita Electric Industri-*

*al Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## II. PROCEDURAL HISTORY

Plaintiffs, who are all past or current employees of Defendant MGM Brakes (MGM), brought suit alleging violations of 42 U.S.C. § 2000e, *et. seq.* Their complaint alleges seven claims: hostile work environment, retaliation, constructive discharge, wrongful discharge in violation of public policy, intentional and negligent infliction of emotional distress, and negligent hiring and retention. Defendants MGM and Indian Head Industries, Inc. (Indian Head), which owns MGM, moved for summary judgment, attacking each cause of action. Defendant Barnett also moved for summary judgment, claiming Plaintiffs could not establish causes of action against him individually for infliction of emotional distress and negligent hiring.

## III. FINDINGS OF FACT

Defendants MGM and Indian Head contend the Plaintiffs are limited to allegations of conduct which occurred during the 180–day period prior to their filing of complaints with the Equal Employment Opportunity Commission (EEOC). Plaintiffs Cox and Ledford filed charges on January 10, 1996, on behalf of themselves and the other female employees of MGM; Plaintiff Stalcup filed charges on March 19, 1996; Plaintiffs Hogsed and Dalrymple followed suit on August 21, 1996; and, on May 21, 1997, Plaintiffs Hogsed and Dalrymple filed additional charges. If a Plaintiff is able to show an alleged discriminatory event during that 180–day period, then she may argue that events occurring prior to that time were part of a continuing violation; and, thus may be considered. *Hawkins v. PepsiCo, Inc.,* 203 F.3d 274, 281 n. 2 (4th Cir.2000). Thus, in considering the facts, these time periods will be considered.

Plaintiff Cox testified that a co-worker, Tommy Byers, told her he had an erection and grabbed her to force her hand on his penis. **Exhibit 14, Deposition of Yolanda Cox,** *contained in* **Plaintiffs' Appendix of Deposition Excerpts Submitted in Opposition to Defendants' Motion for Summary Judgment, filed April 24, 2000, at 24 ["Plaintiffs' Appendix of Excerpts"].** The Plaintiffs also served answers to the Defendants' interrogatories in which this event is alleged to have occurred in July 1995. **Exhibit B,** *attached to* **Defendants' Brief in Support of Motion for Summary Judgment, filed April 4, 2000.** During that same month, Byers asked Cox to meet him outside during their break in order to have sex, although the language allegedly used was more explicit. *Id.;* **Cox Deposition, at 29.** On July 17, 1995, Cox's birthday, Cox asked her supervisor, Gerald Chastain, to escort her to her car because in the past, female co-workers had been "hosed down" on their birthdays by male co-workers. **Cox Deposition, at 65–66.** When she got to her car, co-worker Darrell Sudderth picked her up, threw her over his shoulder and took her over next to a building where he laid her down on the road. *Id.* She was held down by two co-workers while a third sprayed her with water from a hose. *Id.,* at 67. Chastain witnessed the incident but laughed as it was happening. *Id.* Cox's clothing was soaked, making her undergarments visible. *Id.,* at 124. Also during July 1995, co-worker Ralph Carter grabbed under the Plaintiff's buttocks when she was reaching for equipment from a shelf. *Id.,* at 68. In October 1995, Cox and Plaintiff Ora Mae Ledford were walking down an aisle at the end of their work shift when co-worker John Horton yelled, "Ora Mae, Yolanda, go home and dream about big foot." *Id.,* at 72. Horton had taken the wrapper off of a pizza box which he then rolled up and placed at his penis to simulate a large penis. *Id.,* at 72–73.

Ora Mae Ledford also testified to incidents of sexual harassment during the time period at issue. On November 10, 1995, Ledford was leaving work around midnight when Darryl Sudderth, who had

been hiding and waiting for her, grabbed her from behind and threw her onto his shoulder. **Exhibit 13, Deposition of Ora Mae Ledford,** *contained in* **Plaintiffs' Appendix of Excerpts, at 9.** Eddie Hayes tied up her feet and about that time John Horton drove up in a truck and yelled, "Throw her in here, we'll get her whether she's willing or not." *Id.* When Ledford threatened the men, Sudderth carried her across the parking lot and threw her on the top of her car. *Id.* She untied her feet, got in her car and left. *Id.* Ledford resigned the next day. *Id.* In the late summer of 1995, Defendant Barnett told Ledford that she had a phone call in his office. *Id.,* at 137–41. After Ledford completed the telephone call, Barnett began unzipping his pants and asked her to look at his penis, saying, "Just look at it one time." *Id.* In the fall of 1995, John Horton, who was a supervisor in quality control, saw Ledford coming back from lunch with a male co-worker. *Id.,* at 143. He yelled loudly that he wanted to smell the man's finger. *Id.* Later, Horton accused Ledford of having sex with Barnett, although again the language used was sexually explicit. *Id.,* at 145. On another occasion that fall, Defendant Barnett locked Ledford in his office and asked to have sex with her. *Id.,* at 148–52. In November 1995, Ledford was using the pay phone in the cafeteria when Brian White came up behind her, grabbed her hand and put it on his erect penis. *Id.,* at 159.

In the fall of 1995, Larry Dockery repeatedly asked Plaintiff Phyllis Stalcup, who was married, to date him. **Exhibit 15, Deposition of Phyllis Stalcup,** *contained in* **Plaintiffs' Appendix of Excerpts, at 103.** He made other lewd comments about her body and her husband's inability to please her. *Id.* On another occasion that fall, a co-worker set a cup of coffee at Ledford's work station and said that Joe Barnett wanted to see her breasts in exchange for the coffee. *Id.,* at 107. In November 1995, someone posted a sexually explicit cartoon at the time clock and wrote Stalcup's name on it. *Id.,* at 112–13.

In July or August of 1995, Cecil Lunsford, who was a supervisor, tried to hug Plaintiff Janine Dalrymple. **Exhibit B, Answers to Interrogatories,** *attached to* **Defendants' Brief.** In the spring of 1996, Larry Dockery repeatedly tried to hug Dalrymple. **Exhibit 17, Deposition of Janine Dalrymple,** *contained in* **Plaintiffs' Appendix of Excerpts, at 167.** Around that same time, another co-worker grabbed her leg. *Id.,* at 178. Other incidents occurred throughout 1996 and 1997.

In the summer of 1995, a co-worker reported to Plaintiff Marie Hogsed that someone had drawn a sexually explicit cartoon of her with a man on the wall of the men's room. **Exhibit 19, Deposition of Marie Hogsed,** *contained in* **Plaintiffs' Appendix of Excerpts, at 43.** Also in 1995, Howard Johnson pinned Hogsed to a table with his forklift for about 3 or 4 minutes, laughing at her when she screamed for him to back up the forklift. *Id.,* at 81–82. Male co-workers frequently "howled" at Hogsed when she walked through an area. *Id.,* at 94. As with the other Plaintiffs, such incidents continued in 1996 and 1997.

William Boyd Phillips, an employee at MGM during this time, has averred that until 1996 or 1997, "it was an everyday occurrence for male employees to proposition female employees for sex. During that period it was also common for male employees to talk of things of a sexual nature to female employees." **Exhibit 3, Affidavit of William Boyd Phillips,** *contained in* **Plaintiffs' Appendix of Affidavits submitted in Opposition to Defendants' Motion for Summary Judgment, filed April 24, 2000, at ¶ 4 ["Plaintiffs' Appendix of Affidavits."].** He also acknowledged the cartoon using Hogsed's name. *Id.,* at ¶ 6. Attached to his affidavit are copies of numerous sexually explicit cartoons, some of which were found in his supervisor's office. **Exhibits A–H,** *attached to* **Phillips Affidavit.**

All of the above incidents fell within the statutory time frame of 180 days prior to the filing of an EEOC complaint. Thus, in order to ascertain whether these incidents were "continuing violations," a comparison to incidents outside that time frame must be made.

Phyllis Stalcup averred that in 1994, a co-worker asked if she was wearing underwear and invited her to a motel. **Exhibit 9, Affidavit of Phyllis Stalcup,** *contained in* **Plaintiffs' Appendix of Affidavits, at ¶ 4.** Cecil Lunsford, a supervisor, stuck his hand down the front of her overalls and touched her near her crotch. *Id.* David Roach told her he was old but would try to obtain an erection for her. *Id.* He described having sex with a woman on his desk at work. *Id.,* **at ¶ 5; Stalcup Deposition, at 78.** On "dozens and dozens of occasions, he'd ask me to go home and have sex with him." *Id.,* **at 79.** Moreover, Jimmy Wilson and Cecil Lunsford, MGM supervisors, overheard his comments but nothing was done. *Id.,* **at 80.** In fact, Wilson, who was married, repeatedly asked Stalcup for dates. *Id.,* **at 82.** And, Lunsford constantly tried to touch her breasts and groin area. *Id.,* **at 102.** Throughout her employment at MGM, cartoons showing explicit sex scenes were distributed. *Id.,* **at 23.** In fact, during her job interview, Defendant Barnett rubbed her arm. *Id.,* **at 73.** Male employees constantly talked about sex, asked her out and commented on her body. *Id.,* **at 77.**

In the early part of 1995, Ralph Carter, on numerous occasions, stared at Yolanda Cox, whistled at her and brushed up against her. **Cox Deposition, at 21–22, 55.** When she reported this to her supervisor, he laughed at her. *Id.,* **at 56.** In June 1995, Harold Rogers, a drunk co-worker, chased Cox up and down the aisles of the plant and tried to force her to dance with him. *Id.,* **at 61.** When she complained to her supervisor, he laughed and said, "Well, what are you doing to the little men in the back?" *Id.,* **at 63.**

In June 1995, Rogers, again drunk on the job, grabbed Ora Mae Ledford by the wrists and told her he loved her. **Ledford Deposition, at 80–81.** He held her so tightly that she had fingerprints on her arms. *Id.* When she got away from him, she hid in the bathroom for 30 minutes until he left. *Id.* In April 1994, Larry Dockery told Ledford the male co-workers had a $100 bet on who would be the first man at work to sleep with her. *Id.,* **at 99.** In July 1994, Scott Rogers grabbed Ledford's crotch. *Id.,* **at 104–05.** When she reported this to her supervisor, his response was, "That's just the way it is." *Id.* She then complained to Defendant Barnett who laughed. *Id.* A male co-worker also spoke to Barnett about it and reported that Barnett's attitude was that if Ledford did not like the situation, she could find another job. *Id.,* **at 105.** That same summer, Larry Dockery came to work drunk, shoved Ledford against a table and asked why she would not go out with him. *Id.,* **at 108–09.** In early fall of 1994, Defendant Barnett asked Ledford to come to his office at which point he grabbed her breasts and tried to kiss her. *Id.,* **at 111–12.**

In 1993, male co-workers rubbed their bodies against Janine Dalrymple every time they walked past her. **Dalrymple Deposition, at 36–37.** When she complained to her supervisor, he told her it was her problem. *Id.,* **at 38.** One of those employees told her that if she would flirt, things would get better. Dockery also asked her to go to a motel with him during that year. *Id.,* **at 47.**

## IV. DISCUSSION

### A. The "continuing violation" issue.

■ Considering each Plaintiff individually, there is no question that during the 180–day period prior to the EEOC filings each of the Plaintiffs have alleged incidents of sexual harassment. The issue is whether these incidents constitute a continuing violation. The Fourth Circuit has recently acknowledged that it "has never delineated what constitutes a 'continuing

'violation.'" *Emmert v. Runyon,* 178 F.3d 1283 (table), 1999 WL 253632 at *4 (4th Cir.1999). However, the Circuit did acknowledge that other circuits, including the Fifth Circuit, have developed tests for determining whether a claimant has suffered from a continuing violation. *Id.* Therefore, it must be determined whether the alleged conduct constitutes "a series of related acts, one or more of which falls within the limitations. period." *Messer v. Meno,* 130 F.3d 130, 134–35 (5th Cir.1997), *cert. denied,* 525 U.S. 1067, 119 S.Ct. 794, 142 L.Ed.2d 657 (1999).

Although there is no definitive standard for what constitutes a continuing violation, the plaintiff must demonstrate more than a series of discriminatory acts. [S]he must show an organized scheme leading to and including a present violation, such that it is the cumulative effect of the discriminatory practice, rather than any discrete occurrence, that gives rise to the cause of action. This inquiry may involve several factors, including the following three:

The first is subject matter. Do the alleged acts involve the ·same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring ... or more in the nature of an isolated work assignment or employment decision? The third factor ... is degree of permanence....

Importantly, however, the particular context of individual employment situations requires a fact-specific inquiry that cannot easily be reduced to a formula.

*Huckabay v. Moore,* 142 F.3d 233, 239 (5th Cir.1998) (quoting *Berry v. Bd. of Supervisors,* 715 F.2d 971, 981 (5th Cir.1983)) (other citations omitted).

▮ Viewing the facts in the light most favorable to the Plaintiffs, the ramp-

ant sexual harassment, amounting to assaults on more than one occasion, which occurred at MGM involved the same type of discrimination on a recurring basis. Contrary to the Defendants' contention, these were not isolated events involving different male co-workers. Time after time, year after year, the same men, allegedly including the plant manager and supervisors, harassed these women. Two of the men frequently came to work intoxicated. Sudderth "hosed down" Cox and threw Ledford over his shoulder while another co-worker tied her feet. Barnett allegedly assaulted and harassed three of the four Plaintiffs, as did Larry Dockery. Cecil Lunsford, another supervisor, harassed two of the four. These were not isolated occurrences but recurring events by men who were neither in control of their behavior nor disciplined for their conduct. "The ongoing [sexual] harassment suffered by [the Plaintiffs] was all of the same sort, it was continual, and it was a permanent condition of [their] workplace. And the pattern of harassment was not the kind of violation that—like a discrete instance of discriminatory conduct—would put a worker on notice that [her] rights had been violated." *Huckabay,* 142 F.3d at 239. There is every indication from the evidence forecast by the Plaintiffs that they knew complaints would lead to no corrective action; and indeed, could make matters worse. Some of the harassers were supervisors; other supervisors told the Plaintiffs nothing could be or would be done. Clearly, they "[were] not aware that [they] had an avenue to pursue a grievance for said conduct until sometime within the 180 days immediately preceding the filing of [their] charge[s] with the EEOC." *Barber v. City of Conover,* 73 F.Supp.2d 576, 583 (W.D.N.C.1999). The undersigned therefore concludes that the conduct within the statutory time period was a continuing violation.[1]

---

1. The Court rejects the Defendants' argument that conduct having no sexual connotation cannot constitute harassment sufficient to create a hostile environment. The incidents involving the Plaintiffs occurred due to their gender, whether or not sex was mentioned. "A work environment consumed by remarks that intimidate, ridicule, and maliciously de-

**B. Plaintiffs' claims for wrongful discharge.**

■ Plaintiffs' complaint alleges Title VII claims for sexual discrimination by means of hostile work environment, retaliatory conduct and constructive discharge. They also allege a common law claim for wrongful discharge in violation of North Carolina's Equal Employment Practices Act (EEPA), N.C.Gen.Stat. § 143–422.2.[2] Citing *Smith v. First Union*, 202 F.3d 234 (4th Cir.2000), the Magistrate Judge determined the Plaintiffs may not state a private cause of action for wrongful discharge under the EEPA.

In *Smith*, the plaintiff asserted a claim for sexual harassment under the EEPA. The Circuit held:

> Neither the North Carolina Supreme Court nor the North Carolina Court of Appeals has recognized a private cause of action under the NCEEPA. *Instead, most courts have applied the NCEEPA only to common law wrongful discharge claims or in connection with other specific statutory remedies.*

*Smith*, 202 F.3d at 247 (emphasis added). In the fourth claim for relief in the complaint, Plaintiffs clearly allege a common law claim for wrongful discharge in violation of state public policy as stated in the EEPA.[3] In *Hughes v. Bedsole*, 48 F.3d 1376 (4th Cir.1995), the Circuit ruled that the EEPA "does not provide for a specific statutory remedy, and we therefore analyze Hughes' claims under the North Carolina common law of wrongful discharge." *Id.*, at 1383 n. 6. The plaintiff in *Hughes* alleged she had been wrongfully discharged on the basis of her sex. The Circuit thus recognized such a cause of

action and the Court finds the *Smith* case, in which the Circuit held there is no private cause of action for sexual harassment under the EEPA, inapposite. *See, e.g., Emmons v. Rose's Stores, Inc.*, 5 F.Supp.2d 358, 364 (E.D.N.C.1997), *aff'd*, 141 F.3d 1158, 1998 WL 205870 (table) (4th Cir.1998) **(Plaintiff could have stated a claim for wrongful discharge in violation of EEPA based on alleged sexual discrimination)**; *DeWitt v. Mecklenburg County*, 73 F.Supp.2d 589, 604–05 (W.D.N.C.1999); *Bayles v. The Fidelity Bank*, 44 F.Supp.2d 753, 759 (M.D.N.C. 1998); *Bradley v. CMI Industries*, 17 F.Supp.2d 491, 499 (W.D.N.C.1998); *Justice v. Saint Augustine's College*, 1998 WL 303524 *9 (E.D.N.C.1998).

■ Defendants argue that such a common law claim is recognized only where the plaintiff has been terminated, not constructively discharged. However, North Carolina courts have recently recognized that a plaintiff could state a claim for wrongful discharge based on constructive discharge following unwanted sexual advances, touching and harassment. *Graham v. Hardee's Food Systems, Inc.*, 121 N.C.App. 382, 386, 465 S.E.2d 558, 561 (1996).

**C. Claims of retaliation.**

■ Plaintiffs Hogsed and Dalrymple have alleged they were retaliated against for filing EEOC complaints. The retaliation took the form of harassment from coworkers who refused to cooperate with them on various work-related tasks, who variously ridiculed them or shunned them, who poured trash on the table where one of them customarily ate, who wrote "bitch"

---

mean the status of women can create an environment that is as hostile as an environment that contains unwanted sexual advances." *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 242 (4th Cir.2000).

**2.** That statute provides in pertinent part: "It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on ac-

count of ... sex ... by employers which regularly employ 15 or more employees."

**3.** The Magistrate Judge cited to the jurisdictional allegations of the complaint in concluding that Plaintiffs had not alleged a common law wrongful discharge claim. However, in their fourth claim for relief, such a claim is explicitly set forth.

on one of their chairs and who hid parts from them. Although Dalrymple is still employed at MGM, Hogsed was terminated in February 1998.

■ "A plaintiff makes out a prima facie case of retaliation by showing that she engaged in a protected activity, that she suffered an adverse employment action, and that the two were causally related." *Glover v. South Carolina Law Enforcement Div.*, 170 F.3d 411, 413 (4th Cir. 1999), *cert. dismissed*, 520 U.S. 1146, 120 S.Ct. 1005, 145 L.Ed.2d 1065 (Feb. 7, 2000). By filing EEOC charges, both Hogsed and Dalrymple engaged in protected activity. *Id.*, at 414. Due to the conduct of male co-workers, Hogsed was subsequently transferred to a different position against her wishes, an action which qualifies as a causally related adverse employment action. *Id.* Dalrymple, however, is still working at MGM. The issue, then, is whether a retaliatory hostile work environment constitutes retaliatory conduct by the employer and an adverse employment action.

> In no case in this circuit have we found an adverse employment action to encompass a situation where the employer has instructed employees to ignore and spy on an employee who engaged in protected activity, without evidence that the terms, conditions, or benefits of her employment were adversely affected.... We note that, although the district court found that [plaintiff's supervisor] knew of and did not address [plaintiff's] employment-related complaints, the district court also found that [her] employment-related complaints *were addressed, investigated and, where appropriate, corrected, by other employees of [defendant].*

*Munday v. Waste Management of North America, Inc.*, 126 F.3d 239, 243 (4th Cir. 1997), *cert. denied*, 522 U.S. 1116, 118 S.Ct. 1053, 140 L.Ed.2d 116 (1998) (emphasis added). Both Hogsed and Dalrymple allege that MGM ratified their co-workers' conduct by failing to take any disciplinary measures to protect them. This, they argue, affected the conditions of their employment because it made their jobs more difficult to perform.

Plaintiffs note the deposition testimony of the Human Resources manager at the time, Michael Carlson, in which he admits that he could not ascertain the truth of their complaints about co-workers' conduct. **Exhibit 3, Deposition of Michael P. Carlson, *contained in* Plaintiffs' Appendix of Excerpts, at 53–75.** On one occasion, he spoke with Hogsed and Dalrymple and suggested they smile and try to be friendly to their co-workers. *Id.* When Dalrymple complained that Jeff Frady was continuing to harass her, a supervisor was assigned to investigate the matter. *Id.* However, when Frady claimed the comments were not directed at Dalrymple, nothing further was done. *Id.* Likewise, when Plaintiffs complained to their supervisor that co-workers were hiding parts from them, the supervisor simply questioned the co-workers who denied the allegations. **Exhibit 5, Deposition of Jimmy Wilson, *contained in* Plaintiffs' Appendix of Excerpts, at 88.** On two occasions after Plaintiffs filed their EEOC charges, the lock on their locker had been glued so that they could not open the locker. **Phillips Affidavit, at ¶ 10.** Hogsed reported these incidents to Wilson who never questioned Phillips, or any other employee, about them. *Id.* During employee meetings, derogatory comments were made about Hogsed in front of the supervisor who did nothing. **Exhibit 7, Affidavit of Arnold A. Clark, *contained in* Plaintiffs' Appendix of Affidavits, at ¶ 9.** Clark once helped Dalrymple put some things in her car. *Id.*, at ¶ 14. While doing so, a co-worker swerved his truck at them as if he was going to hit them. *Id.* They had to lean against the car in order to avoid being hit. *Id.* This incident, as well, was reported to a supervisor. *Id.*

The record does not "demonstrate[ ] that the [defendant] took prompt remedial action reasonably calculated to end the

alleged retaliatory harassment...." *Wilson v. Southern Nat'l Bank of North Carolina*, 92 F.3d 1184 (table), 1996 WL 445088 *5 (4th Cir.1996). Based on the forecast of evidence, the Plaintiffs withstand summary judgment.[4] Moreover, Hogsed claims her termination in 1998 was causally related to her EEOC charges. Because MGM failed to respond to this allegation, this claim as well survives.

## D. Claims of intentional and negligent infliction of emotional distress

■ Plaintiffs also bring claims for intentional and negligent infliction of emotional distress.[5] Defendants contend that Plaintiffs' allegations of sexual harassment do not rise to the level of "extreme and outrageous" conduct necessary to sustain an emotional distress claim under the law of North Carolina. The Court disagrees. North Carolina courts employ the description of "extreme and outrageous" conduct set out in the *Restatement (Second) of Torts*. *Waddle v. Sparks*, 331 N.C. 73, 414 S.E.2d 22 (1992). Although the Court agrees with Defendants that it is "extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery," **Defendants Indian Head Industries, Inc., and MGM Brakes' Objections to Magistrate Judge's Second Memorandum and Recommendation, at 12** (quoting *Wilson v. Southern Nat'l Bank of North Carolina*, 900 F.Supp. 803, 812 (W.D.N.C.1995)), this case appears to be just such an "extremely rare" occurrence. Viewed in the light most favorable to the nonmovants, Plaintiffs have sufficiently alleged conduct which is "extreme and outrageous" under the laws of North Carolina.

## E. The claim against Defendant Barnett individually.

■ The Magistrate Judge recommended that the claim for negligent hiring and retention asserted against Barnett in his individual capacity be dismissed. He also recommended dismissal of the claims for negligent and intentional infliction of emotional distress except as to Plaintiff Ledford. Barnett objects, arguing this Court should decline to exercise supplemental jurisdiction over this state law claim because failure to do so will force him to attend a lengthy trial with counsel. He also argues that evidence against the corporate Defendant will be inadmissible against him, resulting in the possibility of confusion.

The undersigned rejects these arguments. Defendant Barnett was allegedly personally involved in a majority of the incidents reported; and he was responsible for plant management throughout the time at issue. Contrary to Defendant's position and because of his managerial role, Barnett's testimony is unlikely to be short and limited to accusations against him individually. It would be a tremendous waste of judicial resources to force Plaintiff Ledford to pursue her case against Barnett in state court when the parties are now on the eve of trial. Discovery has been completed, the issue is ready for disposition and there are no novel or complex issues of state law. *Ward v. Eli Lilly & Co.*, 173 F.3d 853 (table), 1999 WL 150768 *2 (4th Cir.1999); *Connelly v. General Medical Corp.*, 880 F.Supp. 1100, 1118 (E.D.Va. 1995).

## V. ORDER

**IT IS, THEREFORE, ORDERED** that the motion of Defendant MGM for summary judgment is hereby **DENIED;** and

---

4. Similarly, Defendants object to the Magistrate Judge's failure to recommend that the constructive discharge claims brought by Plaintiffs Cox and Ledford be dismissed. Again, based upon the forecast of evidence and applicable law, Plaintiffs withstand summary judgment. Accordingly, the Court will adopt the Magistrate Judge's recommendation and the constructive discharge claims will survive.

5. Plaintiffs' claims for intentional and negligent infliction of emotional distress against Defendant Barnett in his individual capacity are discussed *infra*.

**IT IS FURTHER ORDERED** that the motion of Defendant Barnett for summary judgment is hereby **GRANTED** in part and **DENIED** in part and the claim of Plaintiff Ledford against Barnett for negligent and intentional infliction of emotional distress remains for trial and the claims of the Plaintiffs against Barnett for negligent hiring and retention are hereby **DISMISSED.**

## MEMORANDUM AND RECOMMENDATION

COGBURN, United States Magistrate Judge.

**THIS MATTER** is before the court upon defendant Franklin Barnett's Motion for Judgment on the Pleadings. Having considered that motion carefully, reviewed the pleadings, and conducted a hearing, the undersigned enters the following findings, conclusions, and recommendation.

## FINDINGS AND CONCLUSIONS

### I. Standard Applicable to Motions for Judgment on the Pleadings

A motion for judgment on the pleadings is appropriate where ultimate facts are not in dispute. *A.S. Abell Co. v. Baltimore Typographical Union*, 338 F.2d 190, 193 (4th Cir.1964). Under Rule 12(c), Federal Rules of Civil Procedure, judgment on the pleadings should be entered where it is apparent that there are no issues of material fact and that only questions of law exist. *Moreno v. University of Maryland*, 420 F.Supp. 541 (D.Md.1976), *aff'd*, 556 F.2d 573 (4th Cir.1977). When there are no factual issues, judgment on the pleadings should be granted where the moving party clearly is entitled to the judgment it seeks as a matter of law. *Jadoff v. Gleason*, 140 F.R.D. 330, 331 (M.D.N.C.1991).

### II. Background

As to Defendant Barnett, the factual background of this case follows a fact pattern common to recent Title VII cases. Plaintiffs contend that a supervisory employee of the corporate defendant not only turned a blind eye towards sexual harassment of female employees by male employees in the industrial workplace, but encouraged such conduct by berating employees who complained about it. In addition, it is the contention of at least one plaintiff that Defendant Barnett engaged in outrageous conduct, which included the nonconsensual touching of the private parts of females whom he supervised. Defendant Barnett has moved to dismiss the Title VII claim against him under recent precedent and has also moved to dismiss the supplemental state-law claims.

### III. Discussion

#### A. Title VII Claim Against a Supervisory Employee

The court agrees with Defendant Barnett that the reasoning of the Court of Appeals for the Fourth Circuit in *Lissau v. Southern Food Service, Inc.*, 159 F.3d 177 (4th Cir. October 28, 1998), compels this court to recommend dismissal of the Title VII claim brought against him. Clearly, a supervisory employee is not an "employer" under *Lissau.*

#### B. Supplemental Claims

Defendant Barnett has also requested dismissal of the supplemental state-law claims, arguing that claims have not been stated under Rule 12(b)(6) and that this court should decline to exercise jurisdiction over those claims in accordance with 28, United States Code, Section 1367(c).

#### 1. Wrongful Discharge and Interference with Employment in Violation of the Public Policy of North Carolina

Defendant Barnett argues that plaintiffs' state-law claims for wrongful discharge are based upon the public-policy exception to the at-will employment doctrine under Chapter 143–422.2; a contract of employment is required to state a claim under the public-policy exception; and the statute

limits liability exclusively to employers. In support of that proposition, Defendant Barnett cites *Sides v. Duke University*, 74 N.C.App. 331, 328 S.E.2d 818 (1985), which held that the individual defendant could not be held liable for wrongful discharge where the employment contract of the discharged plaintiff was with Duke University, not the individual defendant. Subsequent decisions of the North Carolina courts, however, have allowed actions to proceed against supervisory employees. *See Amos v. Oakdale Knitting Co.*, 331 N.C. 348, 416 S.E.2d 166 (1992); *Williams v. Hillhaven Corp.*, 91 N.C.App. 35, 370 S.E.2d 423 (1988); and *Lenzer v. Flaherty*, 106 N.C.App. 496, 418 S.E.2d 276 (1992).

A recent, unpublished decision of Honorable Lacy H. Thornburg, United States District Judge, in *EEOC v. Tar Heel Capital, Inc.*, 1:98cv84, 1998 WL 1472862 (W.D.N.C. December 3, 1998), may impact this case. In *Tar Heel Capital*, the undersigned recommended that state-law claims similar to those in this case be dismissed as not recognized by state law. In relevant part, Judge Thornburg determined, as follows:

> The North Carolina Supreme Court rules that the "ultimate purpose of ... G.S. 143–422.2 and Title VII (42 U.S.C. § 2000e, *et seq.*) is the same," and thus the statute is co-extensive with the federal statute, evaluated under the same standards of evidence and principles of law. This interpretation of the overlap of the state and federal statutes is the rule of the Fourth Circuit as well.
>
> \* \* \* \* \* \*
>
> A plaintiff pleading the acts of an employer demanding sexual favors and engaging in unwelcome fondling states a claim under Title VII; acts such as intimidation, ridicule, and insult can also give rise to a valid claim of sexual harassment under Title VII.
>
> \* \* \* \* \* \*
>
> Thus, as a cause of action sexual harassment exists under Title VII, pursuant to

the reasoning set forth by the North Carolina Supreme Court in *Gibson*, a cause of action for sexual harassment also exists under N.C.Gen.Stat. § 143–422.2.

*Id.*, at \*5 (case citations omitted; copy of opinion attached to this recommendation). Even though Chapter 143–422.2 and Title VII are co-extensive, the undersigned finds that North Carolina would not likely follow the federal lead, inasmuch as North Carolina law has developed to allow a cause of action for wrongful discharge against supervisory employees. The undersigned, therefore, will recommend that Defendant Barnett's Motion for Judgment on the Pleadings as to plaintiffs' claim of wrongful discharge be denied.

### 2. Intentional Infliction of Emotional Distress

North Carolina recognizes a cause of action for intentional infliction of emotional distress. *Hogan v. Forsyth Country Club*, 79 N.C.App. 483, 488, 340 S.E.2d 116, *disc. rev. denied*, 317 N.C. 334, 346 S.E.2d 140 (1986). According to the *Hogan* court, the elements of the tort are "(1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress." Defendant Barnett concedes that Plaintiff Ledford states a claim, but that the other plaintiffs do not. As to the remainder of the plaintiffs, they argue that they have alleged the elements of a *prima facie* case; under notice pleading, they should be allowed to proceed; and they have alleged conduct that could support their claim, including "coarse and offensive sexual jokes, cartoons, language, unwanted physical contact and inappropriate touching, physical abuse, and other unwelcome conduct of a sexual nature by their male co-workers and supervisors." Under North Carolina law, detailed fact pleading is not required for a claim of intentional infliction of emotional distress to pass Rule 12(b)(6) scrutiny. *Dixon v. Stuart*, 85 N.C.App. 338, 354 S.E.2d 757 (1987). At the summary-judgment stage,

each plaintiff will be required to show as to herself a forecast of an "emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." *Johnson v. Ruark Obstetrics & Gynecology Assoc.,* 327 N.C. 283, 304, 395 S.E.2d 85, *reh'g denied,* 327 N.C. 644, 399 S.E.2d 133 (1990). The undersigned will recommend that Defendant Barnett's Motion for Judgment on the Pleadings as to plaintiffs' claim for intentional infliction of emotional distress be denied.

### 3. Negligent Infliction of Emotional Distress

Plaintiffs have claimed, in the alternative to the intentional tort, that Defendant Barnett committed the tort of negligent infliction of emotional distress. The North Carolina Supreme Court held in *Johnson v. Ruark Obstetrics & Gynecology Assoc., supra* as follows:

> Claims for negligent infliction of emotional distress have been recognized by this Court for at least one hundred years.

> \* \* \* \* \* \*

> Our cases have established that to state a claim for negligent infliction of emotional distress, a plaintiff must allege that (1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress (often referred to as "mental anguish"), and (3) the conduct did in fact cause the plaintiff severe emotional distress.

*Id.,* 327 N.C. at 290, 304, 395 S.E.2d 85. As discussed in the previous section, plaintiffs have quite properly alleged each element of a cause of action for negligent infliction of emotional distress. It appearing that issues of fact remain on this claim, the Motion for Judgment on the Pleadings should be denied for the reasons discussed above.

### 4. Negligent Hiring and Retention

This is, perhaps, plaintiffs' weakest claim from the outset. The theory is that Defendant Barnett was plaintiffs' supervisor and employer; he negligently hired men he knew or should have known would abuse women in the workplace; and after he knew or should have known of the unlawful conduct, he took no steps to terminate the employment of the perpetrators.

To state a claim for negligent hiring and retention, a plaintiff must allege that (1) an employee committed a tortious act against plaintiff; (2) plaintiff was injured by the tortious conduct; and (3) the *employer* was negligent in hiring and retaining the employee when the employer knew or reasonably should have known of the risk of harm to the plaintiff. *Hogan v. Forsyth Country Club, supra.* The issue raised is whether a supervisor is an employer under North Carolina law. That a supervisor could be considered an employer is a stretch of logic. As discussed above, however, North Carolina courts have bucked the federal trend and implicitly recognized such liability through affirming judgments against supervisors, although those were decisions where the specific issue was not presented. *See Medlin v. Bass,* 327 N.C. 587, 398 S.E.2d 460 (1990). Because the undersigned cannot say as a matter of North Carolina law that plaintiffs' claim is precluded, a recommendation must be entered that Defendant Barnett's Motion for Judgment on the Pleadings be denied.

### C. Exercise of Supplemental Jurisdiction Over State–Law Claims

Where the original jurisdiction of the federal court is invoked, as it was here,

> the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or

controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a). A federal court's original jurisdiction extends to nonfederal claims when the federal question is substantial and the claims asserted could be brought in one proceeding. In *United Mine Workers v. Gibbs*, 383 U.S. 715, 727, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Supreme Court found, as follows:

> [If] considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is power in the federal courts to hear the whole.

Section 1367(c) provides a number of reasons for a district court to decline to exercise its supplemental jurisdiction. The only relevant provision is subsection (3), which allows for dismissal of the supplemental claims where "the district court has dismissed all claims over which it has original jurisdiction." While it is likely that the district court will dismiss the Title VII claim against Defendant Barnett, other federal claims remain as to the other defendants and, as to those claims, Defendant Barnett appears to be inextricably intertwined. Although Defendant Barnett has argued that he should not be required to defend the state-law claims in a forum distant from his home in Murphy, the court finds that dismissal in this court would not reduce any costs for him, inasmuch as he would likely be spending a great deal of time involved in this case, with counsel, at depositions, hearings, and trial, as well as defending against the state-law claims in state court. Perhaps most importantly, the state-law claims asserted against Defendant Barnett share a common nucleus of operative facts with those asserted against the corporate defendants, and litigation in two forums

could result in inconsistent judgments. For the reasons stated above, the undersigned will recommend that the district court retain jurisdiction over the remaining supplemental claims asserted against Defendant Barnett.

## RECOMMENDATION

**IT IS, THEREFORE, RESPECTFULLY RECOMMENDED** that defendant Franklin Barnett's Motion for Judgment on the Pleadings be **ALLOWED** as to plaintiffs' Title VII claim as it pertains to Mr. Barnett, but otherwise **DENIED** as to plaintiffs' supplemental state-law claims.

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within ten (10) days of service of same. Failure·to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), *reh'g denied*, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); *United States v. Schronce*, 727 F.2d 91 (4th Cir.), *cert. denied*, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984).

This Memorandum and Recommendation is entered in response to defendant Franklin Barnett's Motion for Judgment on the Pleadings (# __).

## SECOND MEMORANDUM AND RECOMMENDATION

**THIS MATTER** is before the court upon defendants' motions for summary judgment. Having carefully considered those motions and reviewed the pleadings, the undersigned enters the following findings, conclusions, and recommendation.

## FINDINGS AND CONCLUSIONS

### I. Procedural History

Plaintiffs filed this action in August 1998, seeking relief for sexual harassment,

discrimination and retaliation pursuant to 42, United States Code, Sections 2000e, *et seq.;* wrongful discharge in violation of state public policy, as expressed in Chapter 143–422.2 of the North Carolina General Statutes; state-law claims for negligent hiring, retention, and management; and common-law claims for negligent and intentional infliction of emotional distress.

Defendants answered, and defendant Franklin Barnett ("Barnett") also moved for judgment on the pleadings. The undersigned entered a recommendation on that motion, and plaintiffs, thereafter, sought class certification. In its published decision, *Cox v. Indian Head Industries, Inc.*, 187 F.R.D. 531 (1999), the district court affirmed the recommendation in part, rejected it in part,[1] and denied the motion for class certification.

As discussed below, the undersigned respectfully finds that defendants' motions for summary judgment should be granted in part and denied in part and that this matter should be tried during the June 2000 term of court. Specifically, the undersigned finds, as follows:

(1) genuine issues of material fact remain on plaintiffs' Title VII claims;

(2) plaintiffs' remaining claims for wrongful discharge in violation of state public policy are not viable, in light of a recent, published decision of the Court of Appeals for the Fourth Circuit;

(3) all plaintiffs have alleged and presented arguable evidence that could support a favorable finding on their claims asserted against the corporate defendants for negligent and intentional infliction of emotional distress;

(4) with the exception of Ora Mae Ledford's claim, plaintiffs (who concede as much) have not alleged and presented arguable evidence that would support their claims asserted against the individual defendant for negligent and intentional infliction of emotional distress;

(5) plaintiffs' claims for negligent hiring, retention, and management asserted against the corporate defendants survive summary judgment based on genuine issues of material fact;

(6) plaintiffs' mirror claims for negligent hiring, retention, and management asserted against Barnett in his individual capacity should not survive, when considered in light of the district court's decision on the individual-capacity, public-policy claims and a forecast (which federal courts are compelled to do where there is no state precedent and no mechanism for certification) of how North Carolina law is likely to develop on such subject; and

(7) Barnett's request for severance and dismissal without prejudice should be denied.

## II. Summary Judgment Standard Generally

On a motion for summary judgment, the moving party has the burden of production to show that there are no genuine issues for trial. Upon the moving party's meeting that burden, the nonmoving party has the burden of persuasion to establish that there is a genuine issue for trial.

When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial.*" Where the record taken as a whole could not lead a rational trier of

---

1. The district court, concluding that while North Carolina would recognize a claim against an employer for wrongful discharge in violation of public policy, it does not recognize a claim against a supervisor sued in an individual capacity, dismissed such claim that plaintiffs asserted against Barnett individually. *Id.,* at 536.

fact to find for the non-moving [sic] party, there is no "genuine issue for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted; emphasis in the original) (quoting Fed.R.Civ.P. 56). There must be more than just a factual dispute; the fact in question must be material and readily identifiable by the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). By reviewing substantive law, the court may determine what matters constitute material facts. *Id.* "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Id.*, at 248, 106 S.Ct. 2505. A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Id.*

> [T]he court is obliged to credit the factual asseverations contained in the material before it which favor the party resisting summary judgment and to draw inferences favorable to that party if the inferences are reasonable (however improbable they may seem).

*Cole v. Cole*, 633 F.2d 1083, 1092 (4th Cir.1980). Affidavits filed in support of defendants' motions for summary judgment are to be used to determine whether issues of fact exist, not to decide the issues themselves. *United States ex rel. Jones v. Rundle*, 453 F.2d 147 (3d Cir.1971). When resolution of issues of fact depends upon a determination of credibility, summary judgment is improper. *Davis v. Zahradnick*, 600 F.2d 458 (4th Cir.1979).

## III. Factual Background

The undersigned has considered all evidence in a light most favorable to plaintiffs, who are resisting summary judgment. Defendants first argue that only evidence of misconduct within 180 days immediately preceding each plaintiff's administrative

complaint should be considered. That evidence will be summarized.

### A. Yolanda Cox

Within the 180–day period, Cox has presented evidence that she was hosed down by male employees in the parking lot on her birthday so as to expose her undergarments, Cox Depo., at 64–68; a coworker told her to look at his erect penis, *id.*, at 68–70; another coworker ran his hand on her leg and touched her buttocks by placing his hand under and up her pants, *id.*, at 18–20, 68–70; and another coworker/acting supervisor simulated an erection by placing a rolled up "Big Foot" pizza wrapper around his groin area and telling Cox to "dream about my big foot."

### B. Janine Dalrymple

Within the 180–day period, Dalrymple has presented evidence that a male coworker flirted with her and attempted to hug her, Dalrymple Depo., at 178; another coworker grabbed her knee, *id.*; another coworker called her a "bitch," *id.*, at 183–85; another coworker made a comment, "Hello, pretty lady," which she finds offensive, *id.*, at 193–94; another coworker stared at her with an expressionless look, which she finds offensive, *id.*, at 223–24; one coworker told another coworker to "look at [her] ass," *id.*, at 232; she heard various jokes of a sexual nature, which she finds offensive, *id.*, at 233–34; another employee rubbed up against her and stated, "Oh, I didn't mean to get kinky," *id.*, at 240–41; another coworker made kissing noises directed at her, *id.*, at 252–53; and another employee made animal noises and stared at her buttocks, *id.*, at 257–58.

### C. Marie Hogsed

Within the 180–day period, Hogsed has presented evidence that someone carved the word "Bitch" on her work chair, Hogsed Depo., at 93–94; a male janitor walked into the women's room while she was using the facility, *id.*, at 97–99; someone hide her time card, *id.*, at 112–13;

another coworker (with whom other plaintiffs have identified offensive acts) said, "Bye baby, bye baby, I love you," *id.*, at 124–28; she found the words "No puss, no gain," written on a brake, *id.*, at 140; on several occasions Barnett, the plant manager, pushed up against her leg, *id.*, at 140–41; and another coworker tried to kiss her, *id.*, at 148–51.

### D. Phyllis Stalcup

Within the 180–day period, Stalcup has presented evidence that a coworker asked for sex, Stalcup Depo., at 78–80; another coworker asked to touch her body and used foul language, *id.*, at 85–87; another employee asked her if she could suck a golf ball through a 50–foot hose, *id.*, at 100–02; another coworker (with whom other plaintiffs have identified offensive acts) saw vacation pictures of this plaintiff in her bathing suit and commented that she looked good and her husband was not good enough for her, about which she complained to Barnett, *id.*, at 103–06; two coworkers asked to see her breasts in exchange for a cup of coffee, *id.*, at 106–12; and her name appeared on a sexual cartoon posted next to the time clock. *Id.*, at 112–14.

### E. Ora Mae Ledford

Within the 180–day period, Ledford has presented evidence that Barnett attempted to have her look at his penis while they were in his office, Ledford Depo., at 137–40; a coworker/acting supervisor said he wanted to smell another male employee's fingers when he returned from lunch with this plaintiff, *id.*, at 143–45; a coworker/acting supervisor told her that because he saw Barnett's shirt in the back of her car, she "must have been fucking Franklin Barnett in her car," *id.*, at 145–47; Barnett made a sexual advance on her in his office, *id.*, at 148–52; the coworker/acting supervisor attempted to touch her leg and neck, told her he fantasized about her, and made other comments, *id.*, at 154–55; the coworker/acting supervisor again (as he did to Cox) took a rolled up "Big Foot" pizza wrapper and simulated an erection, *id.*, at 158–59; another coworker (with whom other plaintiffs have identified offensive acts) grabbed plaintiff's hand, put it down his trousers, and placed it on his erect penis, *id.*, at 159–61; two coworkers bound plaintiff's feet and carried her to her car, *id.*, at 162; the coworker/acting supervisor hit plaintiff's buttocks with a clipboard, *id.*, at 161; another coworker dropped his trousers and pointed his buttocks in plaintiff's direction, *id.*, at 164; and another coworker made offensive remarks to plaintiff of a sexual nature and whistled at her, *id.*, at 165–66.

As discussed below, the undersigned finds that such proffer is sufficient to show a genuine issue of material fact entitling each plaintiff to go forward to trial on her Title VII claims. Whether evidence predating the 180–day period should be considered under a continuing-violation theory will, therefore, be left to the sound discretion of the district court.

## IV. Discussion

### A. Jurisdiction

This matter arises under Title VII of the Civil Rights Act of 1964, as amended—42, United States Code, Sections 2000e, *et seq.* Plaintiffs claim that they were sexually harassed by coworkers and that some of them were constructively discharged from their employment with defendant. Each plaintiff timely filed charges of discrimination with the Equal Employment Opportunity Commission. This court has jurisdiction over plaintiff's claims. 28 U.S.C. § 1343; 42 U.S.C. § 2000e(5)(f)(3).

In addition to claims made pursuant to the laws of the United States, plaintiffs have made claims governed by the laws of the State of North Carolina for wrongful discharge in violation of public policy; negligent and intentional infliction of emotional distress; and negligent hiring, retention, and management. This court's jurisdiction over those pendant claims is properly laid

pursuant to statutory supplemental jurisdiction, which provides that a federal court's original jurisdiction extends to non-federal claims when the federal question is substantial and the claims asserted could be brought in one proceeding. In *United Mine Workers v. Gibbs*, 383 U.S. 715, 727, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Supreme Court found, as follows:

> [If] considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is power in the federal courts to hear the whole.

Inasmuch as it appears that plaintiffs' state-law claims arise from the same transactions or occurrences upon which their federal claims are based, the issues are properly joined in this action.

### B. Title VII

#### 1. Introduction

Title VII has created two recognized causes of action—*quid-pro-quo* harassment and hostile work environment. The respective burdens in the two types of sexual-harassment claims may be met with direct evidence, introduction of statements, or circumstantial evidence which is relevant and probative. *Moore v. City of Charlotte*, 754 F.2d 1100 (4th Cir.), *cert. denied*, 472 U.S. 1021, 105 S.Ct. 3489, 87 L.Ed.2d 623 (1985). As discussed *supra*, plaintiffs' burden is to show that there are genuine issues of material fact warranting trial.

#### 2. *Quid–Pro–Quo* Harassment

*Quid-pro-quo* harassment is not alleged herein and, therefore, will be discussed only briefly. It is defined as "harassment in which a supervisor demands sexual consideration in exchange for job benefits," *Katz v. Dole*, 709 F.2d 251, 254 (4th Cir. 1983), *see also Spencer v. General Electric Co.*, 894 F.2d 651, 658 (4th Cir.1990); and consists of conditioning employment benefits upon the employee's submitting to the

sexual advances or threatening adverse employment actions if the employee does not submit, *see Tomkins v. Public Serv. Elec. & Gas Co.*, 568 F.2d 1044 (3d Cir. 1977). Some plaintiffs have alleged sexual harassment by supervisory employees; however, no evidence has been presented that any job benefit or detriment (other than working in just such an environment) was conditioned upon submission to such demands. "Benefits" may include the taking of adverse employment action against an employee who refuses to submit to the supervisor's sexual advances. *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554 (11th Cir.1987).

#### 3. Hostile Work Environment

 In order to maintain a claim of hostile work environment, it is required that four specific elements be shown:

(1) that the conduct was unwelcome;

(2) that the harassment was based upon sex;

(3) that the harassment was sufficiently pervasive or severe to create an abusive working environment; and

(4) that some basis exists for imputing liability to the employer.

*Paroline v. Unisys Corp.*, 879 F.2d 100, 105 (4th Cir.1989), *vacated in part*, 1989 U.S.App. LEXIS 13074 (4th Cir.1989), *vacated* 900 F.2d 27 (4th Cir.1990). The "notice" requirement can be rebutted by the employer directly or through evidence which shows the employer took prompt remedial action. *Id.* "Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace." *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 754 (4th Cir.), *cert. denied*, 519 U.S. 818, 117 S.Ct. 70, 136 L.Ed.2d 30 (1996). Rather, its purpose is to protect a "reasonable person" from an environment in which abuse is sufficiently severe or pervasive as to alter the conditions of his or her employment. *Id.* at 753 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 19, 114 S.Ct. 367, 126 L.Ed.2d 295

(1993), and *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). Inasmuch as this is a hostile-work-environment case, each element will be discussed below in the context of a *prima facie* case.

### 4. A *Prima Facie* Case

#### a. Unwelcome Conduct

Each plaintiff has shown, through her own testimony, that she did not welcome the complained-of conduct of the various supervisors and coworkers. Plaintiffs have shown unwelcome conduct.

#### b. Based Upon Sex

Each plaintiff has shown that a great deal of the unwelcome conduct and comments were based upon sex. Defendants take issue with this, arguing that some of the conduct complained of was generic, *i.e.*, that men also got water thrown on them on their birthdays. Plaintiffs have shown, however, that they were *soaked* with water or "hosed down" so as to expose their undergarments. A reasonable inference that would arise from a man soaking a woman's clothes so thoroughly as to reveal what she may or may not have on underneath her outerwear is that such act was done for a lascivious, sexual reason.

#### c. Pervasiveness

As the Court of Appeals for the Fourth Circuit has held: "Whether ... harassment was sufficiently severe or pervasive is quintessentially a question of fact." *Paroline v. Unisys Corp., supra*, at 105. Even if the court were to disregard acts occurring outside the applicable period, evidence has been presented that harassment of a sexual nature had "become diffused throughout every part of" the work environment of these plaintiffs. *Merriam Webster's Collegiate Dictionary*, 10th Ed. Taking plaintiffs' evidence as true, pervasiveness is best shown through what plaintiffs contend is the harassing conduct of the plant manager and acting supervisor.

### d. Basis for Imputing Liability to the Corporate Defendants

 Assuming that plaintiffs have shown unwelcome, pervasive conduct based upon gender, liability cannot attach to the corporate defendants under Title VII unless plaintiffs also prove that the corporate defendants, upon learning of plaintiffs' work environment, took *no* effective action to correct the situation. *Spicer v. Commonwealth of Virginia*, 66 F.3d 705, 710 (4th Cir.1995). While typically an employer has no reason to know of alleged harassment until an employee reports it, *Nash v. Electrospace Sys.*, 9 F.3d 401, 404 (5th Cir.1993), the corporate defendants cannot avail themselves of such protection, inasmuch as evidence has been presented that their own plant manager not only knew of some of the inappropriate conduct, but personally engaged in some of the most offensive conduct alleged. While "liability must cease" when an employer's remedial response results in the cessation of alleged harassment, *Spicer, supra*, at 711, the evidence is negligible of any intervention on the part of management to stem the tide of harassment that these plaintiffs experienced. The undersigned will recommend that defendants' motions for summary judgment on plaintiffs' first cause of action be denied without prejudice as to renewal at the conclusion of plaintiffs' evidence.

### C. Retaliation Claims

In the second claim for relief, plaintiffs Hogsed and Dalrymple contend that defendants retaliated against them for reporting sexual harassment. Dalrymple contends that after it was known in the plant that she had filed formal charges, her favorite break area and her car were "trashed"; coworkers were suddenly rude to her; and fellow female workers, rather than rallying behind her, started making fun of her and her lawsuit. Hogsed further shows that someone wrote "bitch" on her work chair; one of the allegedly harassing coworkers made derogatory com-

ments about the way she moved her hands; and she was transferred from one production line to another, which did not result in a change in benefits or working hours.

There is no promise in Title VII that a person who steps up to the plate to report allegedly unlawful conduct will be protected from public scorn. It has been ever thus. What Title VII does protect is a complainant from retaliatory, adverse employment action by his or her employer. This would include an employer condoning or encouraging unlawful conduct directed at complainants by fellow workers; however, it would not include the normal range of otherwise lawful peer reaction, which could run the gamut from support to ridicule. While these plaintiffs clearly can show that they engaged in protected activity, no proffer of an "adverse employment action" has been made. The undersigned will recommend dismissal of plaintiffs' second claim for relief.

### D. Constructive Discharge

Plaintiffs Cox and Ledford contend that they were constructively discharged from their employment. Under Section 623(a)(1), an employee may claim constructive discharge when "an employer deliberately makes an employee's working conditions intolerable and thereby forces him [or her] to quit his [or her] job." *Holsey v. Armour & Co.*, 743 F.2d 199, 209 (4th Cir.1984), *cert. denied*, 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 784 (1985). In this case, plaintiffs Cox and Ledford contend that while they resigned their employment, their resignations were the result of working conditions deliberately made intolerable by defendants.

■■■■ A Title VII claim of constructive discharge has two elements—"deliberateness of the employer's action, and intolerability of the working conditions." *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir.1985), *cert. denied*, 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986). A claim of constructive discharge is not founded upon a failure to remove the

accused summarily or create a new position to appease the accuser. To allow otherwise would be to mandate the immediate discharge or demotion of employees who are accused of sexual misconduct. As raised by Judge Wilkinson in his dissent in *Paroline:*

> The workplace becomes the world of the accuser where the slightest hesitancy in discharging the target of an accusation may lead the accuser to quit and later hold the Company liable for constructive discharge.... The accused also has an interest, however, in not losing a job or reputation on the basis of an accusation that turns out to be mistaken or downright false. The rule of law must reflect some equation of interests in a controversy.

*Paroline v. Unisys Corp., supra,* at 115. Actions are deliberate where they are "intended by the employer as an effort to force the employee to quit." *EEOC v. Federal Reserve Bank of Richmond,* 698 F.2d 633, 672 (4th Cir.1983), *rev'd on other grounds,* 467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984).

■■■■ A belief by an employee that an employer's remedial steps, if any, will be inadequate does not, *per se*, give rise to a claim for constructive discharge because "the law does not permit an employee's subjective perceptions to govern a claim of constructive discharge." *Bristow v. Daily Press, Inc., supra,* at 1255. Intent may be inferred where a plaintiff can show a failure of the employer to act in the face of intolerable conditions which are known to the employer. *Holsey v. Armour & Co., supra,* at 209. Working conditions are intolerable where a "reasonable person," in the employee's position, would have felt compelled to resign. *Bristow v. Daily Press, Inc., supra,* at 1255. While some may relish and thrive in a work environment detached from respect for the rights of others, reasonable people faced with similar humiliating and sexually degrading conditions would have little choice other

than to resign. Taking as true the evidence presented by plaintiffs Cox and Ledford, they have presented evidence upon which a jury could find in their favor on their claims of constructive discharge. The undersigned will recommend that defendants' motions for summary judgment as to such claims be denied, with leave granted to renew the motion at the close of plaintiffs' evidence.

### E. Wrongful Discharge Claims in Violation of State Public Policy

It is beyond argument that it is the express public policy of the State of North Carolina to protect the right of all people to seek, obtain, and hold employment without discrimination based on sex. Chapter 143–422.2, N.C.Gen.Stat. Plaintiffs Cox and Ledford contend that their alleged constructive discharge constitutes a violation of such public policy and that North Carolina law provides them with a private cause of action. In support of that argument, they cite the district court's opinion in *EEOC v. Tar Heel Capital, Inc.*, 1998 WL 1472862, 1998 U.S.Dist. LEXIS 22268, 1:98cv84 (W.D.N.C.1998). More recently, the Court of Appeals for the Fourth Circuit, in a published decision originating in this district, held, in pertinent part, as follows:

> Neither the North Carolina Supreme Court nor the North Carolina Court of Appeals has recognized a private cause of action under the NCEEPA. Instead, most courts have applied the NCEEPA only to common law wrongful discharge claims or in connection with other specific remedies.

> In *Mullis v. Mechanics & Farmers Bank*, 994 F.Supp. 680 (M.D.N.C.1997), the court held that "[a]bsent a clear indication from the courts or the legislature of North Carolina that a private right of action does exist under the NCEEPA, it would be inappropriate for a federal court to create a private right of action under the NCEEPA, and this court declines to do so." We agree.

*Smith v. First Union National Bank*, 202 F.3d 234, 247 (4th Cir. January 19, 2000)

(citations and footnote omitted). Plaintiffs state in paragraph one of their complaint (*see* docket entry 1) that they are claiming

> sexual harassment, sexual discrimination and unlawful retaliation ... in violation of the public policy of the State of North Carolina, as expressed by N.C.Gen.Stat. § 143–422.2. Plaintiffs *also* seek remedy, pursuant to the common law of North Carolina, for ... negligence in hiring and retaining management, supervisory and other employees, and defendants' negligent and intentional infliction of emotional distress.

Complaint, at 1 (emphasis added). It cannot be seriously argued that the NCEEPA claim has been asserted in connection with a common-law claim; rather, the NCEEPA has been patently asserted as a statutory claim, which is not viable as a matter of controlling law. To that end, the undersigned will recommend that such claim be dismissed.

### F. Intentional Infliction of Emotional Distress

 Defendants have also moved for summary judgment on plaintiffs' state-law claims of intentional infliction of emotional distress. The elements of the tort are "(1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress." *Hogan v. Forsyth Country Club*, 79 N.C.App. 483, 488, 340 S.E.2d 116, *disc. rev. denied*, 317 N.C. 334, 346 S.E.2d 140 (1986). "It is a question of law for the court to determine, from the materials before it, whether the conduct complained of may reasonably be found to be sufficiently outrageous as to permit recovery." *Id.*, at 490, 340 S.E.2d 116. For purposes of making a recommendation as to disposition of defendants' motions, the undersigned has resolved any disputed facts in plaintiffs' favor.

Plaintiffs have asserted claims against Barnett individually for his allegedly wrongful conduct and against the corporate defendants for the conduct of their employees. Plaintiffs concede that all such claims against Barnett, with the exception of the claim asserted by Ledford,

should be dismissed. The undersigned agrees. Ledford has supported her claim against Barnett with evidence which, if found to be credible, could form the basis of a finding of extreme and outrageous conduct intended to cause and causing severe emotional distress.

As to the claims of the plaintiffs against the corporate defendants, when the quantum of conduct (which appears to exceed the 180 days under the three-year limitations period applicable to this common-law claim) is considered, plaintiffs have proffered evidence of acts which "exceed all bounds of decency," *West v. King's Dep't Store, Inc.*, 321 N.C. 698, 365 S.E.2d 621, 625 (1988), which could be " 'regarded as atrocious, and utterly intolerable in a civilized community,' " *Wagoner v. Elkin City School Bd. of Educ.*, 113 N.C.App. 579, 440 S.E.2d 119, 123 (1994) (citation omitted). While much has been discussed in the pleadings about the horseplay and banter in the blue-collar workplace, North Carolina courts will call to task (1) those who engage in primitive and uncivilized behavior in an attempt to impose their prurient will on others or (2) those in positions of authority and responsibility who allow such conduct to occur or continue. In this case, plaintiffs have submitted evidence of both situations. The undersigned will, therefore, recommend that defendants' motions for summary judgment on plaintiffs' common-law claims for intentional infliction of emotional distress be granted in part and denied in part and that Ledford's claim against Barnett, as well as the claims of all the plaintiffs against the corporate defendants, move forward to trial.

### G. Negligent Hiring, Retention, and Supervision

█ Plaintiffs have asserted this common-law claim against not only the corporate defendants, but also the individual defendant. Clearly, the claim against the corporate defendants must survive, inasmuch as genuine issues of material fact exist.

As to the individual defendant, and absent specific guidance from North Carolina decision,[2] the undersigned must forecast whether a North Carolina court would recognize such a cause of action against a supervisory employee. Fortunately, the district court in the published opinion in this matter, *Cox, supra,* has provided a framework:

[I]n a later opinion not cited by the parties, the Court of Appeals definitively stated, "Plaintiff also brought a state law cause of action against defendants for wrongful discharge. The trial court properly dismissed the claim against the individual defendants as they were not plaintiff's employers for the purposes of a wrongful discharge claim." *Lorbacher v. Housing Authority of City of Raleigh*, 127 N.C.App. 663, 671, 493 S.E.2d 74, 79 (1997). The undersigned concludes that North Carolina does not recognize a claim against a supervisor in an individual capacity for wrongful discharge in violation of public policy. Therefore, this claim against Barnett must be dismissed.

*Id.*, at 536–37. It would follow, then, that a claim for negligent hiring, retention, and supervision would be actionable only against employers. While a worker may consider a supervisor to be the embodiment of the employer, a supervisor is only an agent of the employer. Where, as here, no cross-claim or defense has been interposed that Barnett's conduct was *ultra vires*, even his own alleged *negligent* su-

---

**2.** The North Carolina Supreme Court in, Hogan v. Forsyth Country Club Co., 79 N.C.App. 483, 340 S.E.2d 116 (1986), held that the state "recognizes the existence of a claim against an employer for negligence in employing or retaining an employee whose wrongful conduct injures another." *Id.*, at 494, 340 S.E.2d 116. No North Carolina case has been cited for the proposition that a supervisory employee is subject to liability under such a claim. *See* Medlin v. Bass, 327 N.C. 587, 398 S.E.2d 460 (1990) (affirming dismissal of a claim against a supervisory employee on other grounds).

pervision of others would be imputable to the corporate defendants because even negligent acts of a servant are ascribed to the master. *Pleasants v. Barnes,* 221 N.C. 173, 19 S.E.2d 627 (1942). The undersigned, therefore, will recommend that Barnett's motion for summary judgment on such claim be granted and that the corporate defendants' motion be denied.

### H. Barnett's Request for Severance

Barnett has requested severance and dismissal with leave granted these plaintiffs to refile in state court. He argues that, inasmuch as only claims actionable in state court should survive summary judgment, he be allowed to return to such forum where not only would his costs be reduced, but his defense would not be tainted by evidence of alleged bad acts of others. While not unsympathetic to the astonishing costs of litigation or this individual's plight, the undersigned finds that his presence in this action would be necessary even if this court were to grant such relief. The claims against Barnett are the core of plaintiffs' case, and Barnett would most certainly be called as a witness in this matter, which would require travel and the close attention of private counsel to protect his rights. Indeed, Barnett is indispensable in this matter so that this court may accord full and complete relief. Further, the interests of justice are not served through severance, especially where this matter is ready and scheduled to be tried within 30 days.

### RECOMMENDATION

**IT IS, THEREFORE, RESPECTFUL-LY RECOMMENDED** that

(1) the motion of defendants Indian Head Industries, Inc., and MGM Brakes for summary judgment be **ALLOWED** in part and **DENIED** in part, as discussed above; and

(2) defendant Franklin Barnett's motion for summary judgment be **AL-LOWED** in part and **DENIED** in part, as discussed above.

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within ten (10) days of service of same. Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), *reh'g denied,* 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); *United States v. Schronce,* 727 F.2d 91 (4th Cir.), *cert. denied,* 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984).

This Memorandum and Recommendation is entered in response to the motion for summary judgment filed by defendants Indian Head Industries, Inc., and MGM Brakes (# 49) and the motion for summary judgment filed by defendant Franklin Barnett (# 51).

May 16, 2000.